IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF ARKANSAS
TEXARKANA DIVISION

| | |
|---|---|
| ST. JUDE MEDICAL, INC., a Minnesota Corporation, and ST. JUDE MEDICAL PUERTO RICO, LLC, a Puerto Rico Limited Liability Company,<br>　　　　　Plaintiffs,<br>　vs.<br><br>ACCESS CLOSURE, INC., a Delaware Corporation,<br>　　　　　Defendant. | )<br>)<br>)　Case No. 4:08-cv-04101-HFB<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

## **PLAINTIFFS ST. JUDE MEDICAL, INC. AND ST. JUDE MEDICAL PUERTO RICO, LLC'S OPENING CLAIM CONSTRUCTION BRIEF**

## TABLE OF CONTENTS

Page

I.      INTRODUCTION ...................................................................................................... 1

II.     BACKGROUND ....................................................................................................... 2

        A.      Brief Summary Of The Asserted Patents ........................................................ 2

        B.      ACI's Mynx Product ...................................................................................... 3

III.    CLAIM CONSTRUCTION PRINCIPLES .............................................................. 4

        A.      Not Every Term Needs Construction .............................................................. 4

        B.      Claim Terms Should Be Given Their Ordinary And Customary
                Meaning ........................................................................................................ 5

        C.      Intrinsic Evidence Controls Claim Construction ............................................ 6

IV.     ACI'S "INDEFINITENESS" ARGUMENTS HAVE NO MERIT ............................ 7

        A.      "(operatively) associated with" ('602 patent, claims 38, 40) ............................ 8

        B.      "configured to cooperate with" ('602 patent, claim 38) ................................... 9

        C.      "said catheter" ('602 patent, claim 40) ......................................................... 10

V.      DISPUTED CONSTRUCTIONS .......................................................................... 11

        A.      Terms In The Fowler Patents That May Need Construction ............................ 11

                1.      "lumen" ('616 patent, claim 9) .......................................................... 11

        B.      Terms In The Fowler Patents That Need No Construction ............................... 12

                1.      "adjacent" ('602 patent, claim 43) ..................................................... 12

                2.      "vessel plug" ('616 patent, claim 9; '602 patent, claims 38,
                        40, 43; '375 patent, claim 21) .......................................................... 13

                3.      "puncture" ('602 patent, claims 38, 40, 43) / "incision" ('616
                        patent, claim 9; '602 patent, claims 38, 40, 43; '375 patent,
                        claim 21) ......................................................................................... 13

                4.      "dimensioned to be received in" ('616 patent, claim 9) /
                        "dimensioned to be positioned within" ('602 patent, claim
                        40) / "dimensioned to be inserted within (the puncture so
                        that said expandable member is positioned within)" ('602
                        patent, claim 38) .............................................................................. 14

                5.      "relaxed" / "expanded" ('602 patent, claims 38, 40, 43) ...................... 15

Page

6.    "(located / extends) proximally of" ('616 patent, claim 9;
      '602 patent, claim 38; '375 patent, claim 21) ..........................................15

7.    Remaining Terms That ACI Insists Need Construction ........................16

C.   Terms In The Janzen Patents That The Parties Agree Need
     Construction ......................................................................................................17

1.    "lumen" ('498 patent, claim 1) ..................................................................17

2.    "hemostatic material" ('498 patent, claim 1)...........................................17

3.    "threading a plug over said guide wire...[and] moving the
      plug inwardly along the guide wire" ('439 patent, claim 10)..................17

4.    "means for ejecting said plug means from said distal end of
      said elongated member so as to place said plug means in a
      blocking relation with said puncture, so as to seal said
      puncture" ('439 patent, claim 1)...............................................................19

D.   Terms In The Janzen Patents That Need No Construction ..............................21

1.    "adjacent"  ('498 patent, claim 1)............................................................21

2.    "plug" ('439 patent, claims 1, 7, 8, 9, 10) / "plug member"
      ('439 patent, claim 8) / "plug means" ('439 patent, claims 1,
      7) .................................................................................................................22

3.    "puncture" ('498 patent, claim 1; '439 patent, claims 1, 8, 9,
      10) ................................................................................................................23

4.    "guide wire" ('439 patent, claims 9, 10) / "guide element"
      ('439 patent, claim 8) .................................................................................23

5.    "blocking relation" ('439 patent, claims 1, 8, 9, 10) ..............................24

6.    "sized to be fitted through a passageway leading to said
      puncture so that said distal end is disposed near said
      puncture in said artery" ('439 patent, claims 1, 8) ..................................25

7.    Remaining Terms That ACI Insists Need Construction ........................26

E.   Terms On Which ACI Incorrectly Seeks To Impose Means-Plus-
     Function Restrictions ......................................................................................27

1.    "ejecting mechanism for ejecting said plug member from
      said distal end of said elongated member so as to place said
      plug member in blocking relation with said puncture, so as
      to seal said puncture"  ('439 patent, claim 8)..........................................27

Page

2.     "separable plug means for plugging said puncture being
       disposed in said elongate member" ('439 patent, claim 1) /
       "movable guide means extending longitudinally through
       said elongated member and said plug means for extension
       through said puncture for guiding said plug means to said
       puncture" ('439 patent, claim 1).............................................................28

VI.    CONCLUSION................................................................................................30

TABLE OF AUTHORITIES

Page(s)

**Cases**

*ACTV, Inc. v. Walt Disney Co.*,
  346 F.3d 1082 (Fed. Cir. 2003)........................................................................17

*Altris, Inc. v. Symantec Corp.*,
  318 F.3d 1363 (Fed. Cir. 2003)...................................................................11, 26

*Apex, Inc. v. Raritan Computer, Inc.*,
  325 F.3d 1364 (Fed. Cir. 2003)........................................................................27

*Bancorp Servs., L.L.C. v. Hartford Life Ins. Co.*,
  359 F.3d 1367 (Fed. Cir. 2004).......................................................................7, 8

*CCS Fitness Inc. v. Brunswick Corp.*,
  288 F.3d 1359 (Fed. Cir. 2002)........................................................................27

*Commonwealth Sci. & Indus. Research Org. v. Buffalo Tech., Inc.*,
  542 F.3d 1363 (Fed. Cir. 2008)........................................................................19

*Cordis Corp. v. Medtronic AVE, Inc.*,
  339 F.3d 1352 (Fed. Cir. 2003)..........................................................................6

*Datamize, LLC v. Plumtree Software, Inc.*,
  417 F.3d 1342 (Fed. Cir. 2005)..........................................................................7

*Embrex, Inc. v. Service Eng'g Corp.*,
  216 F.3d 1343 (Fed. Cir. 2000)..........................................................................4

*Energizer Holdings v. ITC*,
  435 F.3d 1366 (Fed. Cir. 2006)........................................................................10

*Envirco Corp. v. Clestra Cleanroom, Inc.*,
  209 F.3d 1360 (Fed. Cir. 2000)........................................................................28

*Epistar Corp. v. Int'l Trade Comm'n*,
  566 F.3d 1321 (Fed. Cir. 2009).......................................................................5, 6

*Free Motion Fitness, Inc. v. Cybex Int'l, Inc.*,
  423 F.3d 1343 (Fed. Cir. 2005)..........................................................................7

*Greenberg v. Ethicon EndoSurgery, Inc.*,
  91 F.3d 1580 (Fed. Cir. 1996)....................................................................27, 28

*Innova/Pure Water, Inc. v. Safari Water Filtration Systems, Inc.*,
  381 F.3d 1111 (Fed. Cir. 2004).......................................................................6, 8

*JVW Enterprises, Inc. v. Interact Accessories, Inc.*,
  424 F.3d 1324 (Fed. Cir. 2005)..........................................................................6

- iv -

Page

*Markman v. Westview Instruments, Inc.*,
    52 F.3d 967 (Fed. Cir. 1995)...................................................................................4

*Mentor H/S, Inc. v. Medical Device Alliance, Inc.*,
    244 F.3d 1365 (Fed. Cir. 2001)...............................................................................5

*Micro Chem., Inc. v. Great Plains Chem. Co., Inc.*,
    194 F.3d 1250 (Fed. Cir. 1999)................................................................20, 29, 30

*Minks v. Polaris Indus.*,
    546 F.3d 1364 (Fed. Cir. 2008)..............................................................................19

*Nystrom v. Trex Co.*,
    424 F.3d 1136 (Fed. Cir. 2005).......................................................................14, 24

*Orion IP, LLC v. Staples, Inc.*,
    406 F. Supp. 2d 717 (E.D. Tex. 2005)..................................................................4, 5

*Personalized Media Commc'ns. v. Int'l Trade Comm'n*,
    161 F.3d 696 (Fed. Cir. 1998)................................................................................27

*Phillips v. AWH Corp.*,
    415 F.3d 1303 (Fed. Cir. 2005)..............................................4, 5, 6, 7, 11, 15, 18, 25

*Purdue Pharma L.P. v. Endo Pharma, Inc.*,
    438 F.3d 1123 (Fed. Cir. 2006)................................................................................6

*SRI Int'l v. Matsushita Elec. Corp. of Am.*,
    775 F.2d 1107 (Fed. Cir. 1985)................................................................................6

*Teleflex, Inc. v. Ficosa N. Am. Corp.*,
    299 F.3d 1313 (Fed. Cir. 2002)................................................................................5

*TriMed, Inc. v. Stryker Corp.*,
    514 F.3d 1256 (Fed. Cir. 2008)..............................................................................28

*TurboCare Division of Demag Delaval Turbomachinery Corp. v. General Electric Co.*,
    264 F.3d 1111 (Fed. Cir. 2001)..............................................................................28

*United States Surgical Corp. v. Ethicon, Inc.*,
    103 F.3d 1554 (Fed. Cir. 1997)..................................................................4, 16, 26

*Vulcan Eng'g Co. v. FATA Aluminum, Inc.*,
    278 F.3d 1366 (Fed. Cir. 2002)..............................................................................19

**Statutes**

35 U.S.C. § 112...............................................................................7, 19, 27, 28, 29, 30

## I.    INTRODUCTION

Plaintiffs St. Jude Medical, Inc. and St. Jude Medical Puerto Rico, LLC (collectively, "St. Jude") are worldwide leaders in the field of vascular closure devices, which are used to seal the hole left behind in a blood vessel after a "catheterization" procedure is performed.  In these procedures, tubes are inserted through a hole in the skin of a patient and into a patient's blood vessel for diagnostic or interventional procedures such as angioplasty, angiography, and the like. St. Jude's Angio-Seal® device, various versions of which have been on the market for almost fifteen years, is the market leader for vascular closure devices.  St. Jude owns fundamental patents in this field, including the five patents at issue here.  Defendant AccessClosure, Inc. ("ACI") started commercially producing and selling vascular closure devices in mid-2007 and elected to facilitate its late entry into the market by practicing the inventions of the St. Jude patents asserted in this case.

The vast majority of the claim language at issue here is simple and is easily understood both by those of skill in the art and by lay jurors, based on its plain and ordinary meaning.  Thus in most instances, St. Jude proposes that the actual words of the claims suffice, and that redefinition of terms or phrases is unnecessary.  Where construction is in fact necessary, St. Jude proposes definitions consistent with the term's ordinary meaning and the intrinsic record.

ACI has taken an entirely different approach.  Despite the non-technical claim language, ACI has identified *over forty* terms and phrases that it contends need construction, including such simple terms as "adjacent," "plug," and "seal."  ACI even goes so far as to assert that commonplace patent terms like "associated with" are so incomprehensible as to invalidate the claims in which they appear.  It is only through intentional misunderstanding and relentless redefinition that ACI can hope to fashion "non-infringement" positions; it is impossible to read the claims as written and not immediately recognize how crudely ACI's Mynx device infringes St. Jude's patents.

## II.      BACKGROUND

### A.      Brief Summary Of The Asserted Patents

Each year, millions of catheterization procedures are performed, and result in holes in blood vessels that have to be closed.  Before St. Jude's vascular closure products and the devices described in the asserted patents existed, patients usually had to endure hours of uncomfortable and tedious manual pressure on the skin over the opening in the artery (often involving heavy sand bags) to prevent bleeding once the tubes were removed at the end of these procedures.  The patents at issue in this case describe devices and methods for facilitating faster and more comfortable recovery using novel procedures and tools for sealing the hole in the blood vessel.

U.S. Patent Nos. 5,275,616 ("the '616 patent"), 5,601,602 ("the '602 patent"), and 5,716,375 ("the '375 patent") (collectively, the "Fowler patents"), all entitled "Insertion Assembly and Method of Inserting a Vessel Plug into the Body of a Patient," are descendents of the same parent patent, U.S. Patent No. 5,108,421, filed on October 1, 1990.  Ex. A ('616 patent); Ex. B ('602 patent), Ex. C ('375 patent).  The Fowler patents share a common written description.  St. Jude is asserting claim 14 of the '616 patent; claims 38, 40, and 44 of the '602 patent; and claim 21 of the '375 patent in this case.

Fowler discloses novel vascular closure devices and methods for positioning a plug to seal a hole in a blood vessel.  Among other things, Fowler describes using a positioning element to locate a plug near the hole in a blood vessel.  '375, col. 2:51-66.  In one embodiment, the positioning element is an inflatable balloon that is inserted into the hole in the blood vessel and expanded.  *Id.*, Fig. 3 (shown).  The vessel plug is then inserted until encountering resistance from the balloon.  *Id.*, col. 4:64-67.  With the plug properly positioned, the balloon is deflated and withdrawn.  *Id.*, col. 5:2-6.



Fig. 3

U.S. Patent Nos. 5,725,498 ("the '498 patent") and 7,008,439 ("the '439 patent") (collectively, the "Janzen patents"), both entitled "Device and Method for Sealing Puncture

Wounds," share a common written description, which supports the disparate claims of the two patents; both patents are descendants of the same parent application, originally filed on December 27, 1990.[1]  Ex. D ('439 patent); Ex. E ('498 patent).  St. Jude is asserting claims 7-10 of the '439 patent and claim 1 of the '498 patent against ACI in this case.[2]

Janzen also discloses novel vascular closure devices and methods for positioning a plug to seal the hole in a blood vessel.  *See, e.g.*, '439, col. 1:14-16.  In one exemplary embodiment, a guide wire is used in positioning a sheath containing the plug into the tissue tract created during a catheterization procedure.  *Id.*, col. 2:45-54; 7:40-46; Fig. 14 (shown).  The guide wire guides the plug towards the hole.  *Id.,* col. 7:40-50.  Once the end of the plug "is near to or abuts" the hole in the blood vessel, the sheath is withdrawn, leaving the plug next to the hole. *Id.*, col. 2:45-54; 7:22-29.  The plug obstructs the flow of blood sufficiently so that the blood can, for example, clot. *Id.*, col. 3:37-43.  The plug is later absorbed by the body. *Id.*, col. 2:21-25.



Fig. 14

### B.    ACI's Mynx Product

ACI's "Mynx" device is inserted into the tissue tract created during a catheterization procedure to position an expandable plug to seal a hole in the blood vessel.  ACI depicts the process as shown.  *See* Ex. F.  A guide wire (threaded through a plug) and an inflatable balloon (on the end of the balloon catheter) are used to position the plug at or near the hole in the blood vessel.  *Id.*  Using the guide wire, the balloon is inserted into the hole in the blood



---

[1] Because the line spacing of the patents varies, citations to the Fowler specification will be provided with respect to the '375 patent for consistency.  For the same reasons, citations to the Janzen specification will be provided to the '439 patent.

[2] The asserted claims of both the Fowler and Janzen patents are reproduced in Appendix A. Although St. Jude asserts only ten claims pursuant to the Court's order dated August 28, 2009, St. Jude reserves all rights with respect to the remaining claims, including assertion of them at a later date.

vessel and expanded.  *Id.*  A sheath, with the expandable plug inside, is passed over the guide wire towards the blood vessel until the plug encounters resistance from the balloon.  *Id.*  After the plug is properly positioned, the sheath is withdrawn, allowing the plug to expand.  *Id.*  The balloon is then deflated and, along with the guide wire, withdrawn.  *Id.*  The body later absorbs the plug.  *Id.*

## III.   CLAIM CONSTRUCTION PRINCIPLES

Interpreting the proper meaning and scope of a patent claim is a question of law exclusively for the Court to decide.  *See Markman v. Westview Instruments, Inc.*, 52 F.3d 967, 970-71 (Fed. Cir. 1995) (en banc), *aff'd*, 517 U.S. 370 (1996).  The leading case on the principles of claim construction is *Phillips v. AWH Corp.*, 415 F.3d 1303 (Fed. Cir. 2005) (en banc).  "[T]he construction of claims is simply a way of elaborating the normally terse claim language[] in order to understand and explain, *but not to change*, the scope of the claims."  *Embrex, Inc. v. Service Eng'g Corp.*, 216 F.3d 1343, 1347 (Fed. Cir. 2000) (emphasis added).  "[A]lthough every word used in a claim has a meaning, not every word requires a construction."  *Orion IP, LLC v. Staples, Inc.*, 406 F. Supp. 2d 717, 738 (E.D. Tex. 2005).  A claim term that is clear on its face needs no construction and should be given its plain and ordinary meaning.

Because the Mynx device is so plainly designed according to the foundational patents owned by St. Jude, ACI is forced to argue for constructions that require deviation from these basic principles.  ACI seeks to change the scope of the claims by proposing confusing constructions that distort the claim language and common sense, and encumber the claims with artificial restrictions that have no support in the claims themselves or the rest of the intrinsic record.  This is improper. *Phillips*, 415 F.3d at 1324-27 (reversing district court's claim construction for importing limitations unsupported by the claim language).

### A.   Not Every Term Needs Construction

All words have "definitions" and can theoretically be defined.  This does not mean that all words in a patent claim *need* to be defined.  Simply put, claim construction is "not an obligatory exercise in redundancy."  *United States Surgical Corp. v. Ethicon, Inc.*, 103 F.3d 1554, 1568 (Fed. Cir. 1997).  Construction serves "to clarify and *when necessary* to explain what the patentee

covered by the claims." *Id.* (emphasis added).  Where a term is used in accordance with its plain meaning, the court should not re-characterize it using different language.  *See Orion IP*, 406 F. Supp. 2d at 738 (refusing to construe "parts," "equipment," and "specifications" because they "are common words familiar to most English speakers" that were "all used in accordance with their ordinary lay meanings," and there was no argument "that these terms carr[y] a unique meaning in the art making their construction necessary"); *see also Mentor H/S, Inc. v. Medical Device Alliance, Inc.*, 244 F.3d 1365, 1380 (Fed. Cir. 2001) (terms "irrigating" and "frictional heat" need no construction).  When claim terms are clear on their face, and there is no legitimate dispute regarding their meaning, no construction is necessary.

**B.      Claim Terms Should Be Given Their Ordinary And Customary Meaning**

"It is a bedrock principle of patent law that the claims of a patent define the invention to which the patentee is entitled the right to exclude." *Phillips,* 415 F.3d at 1312 (internal quotes omitted).  Other evidence may be useful to put claim language in context, but "the claim construction inquiry...begins and ends in all cases with the actual words of the claim." *Teleflex, Inc. v. Ficosa N. Am. Corp.*, 299 F.3d 1313, 1324 (Fed. Cir. 2002).  There is "a heavy presumption that claim terms carry their full ordinary and customary meaning, unless [the accused infringer] can show the patentee expressly relinquished claim scope." *Epistar Corp. v. Int'l Trade Comm'n*, 566 F.3d 1321, 1334 (Fed. Cir. 2009).  "[T]he ordinary and customary meaning of a claim term is the meaning that the term would have to a person of ordinary skill in the art in question at the time of the invention." *Phillips*, 415 F.3d at 1313.  The task of comprehending the claims is not always difficult—it often "involves little more than the application of the widely accepted meaning of commonly understood words." *Id.*, at 1314.

ACI labors mightily to sew confusion into even the most basic terms.  ACI's redefinitions of basic terms are unnecessary and improper.  In case the Court finds it necessary to clarify one or more of the basic terms that ACI insists need construction, St. Jude has proposed alternative "contingent" constructions based on ordinary meaning, consistent with the Federal Circuit's

"heavy presumption that claim terms carry their full ordinary and customary meaning." *Epistar*, 566 F.3d at 1334.

    **C.    Intrinsic Evidence Controls Claim Construction**

    The specification can shed light on the meaning of claim terms and should be analyzed during claim construction. *See Phillips*, 415 F.3d at 1315. On the other hand, courts cannot "import limitations into claims from examples or embodiments appearing only in a patent's written description, even when a specification describes very specific embodiments of the invention or even describes only a single embodiment." *JVW Enterprises, Inc. v. Interact Accessories, Inc.*, 424 F.3d 1324, 1335 (Fed. Cir. 2005). The rationale for this rule is straight-forward: "[i]f everything in the specification were required to be read into the claims, or if structural claims were to be limited to devices operated precisely as a specification-described embodiment is operated, there would be no need for claims." *SRI Int'l v. Matsushita Elec. Corp. of Am.*, 775 F.2d 1107, 1121 (Fed. Cir. 1985). Thus, "particular embodiments appearing in the written description will not be used to limit claim language that has broader effect." *Innova/Pure Water, Inc. v. Safari Water Filtration Systems, Inc.*, 381 F.3d 1111, 1117 (Fed. Cir. 2004).

    The court "should also consider the patent's prosecution history, if it is in evidence." *Phillips*, 415 F.3d at 1317. Because the prosecution represents an "ongoing negotiation" rather than the "final product" of the negotiation, "it often lacks the clarity of the specification and thus is less useful for claim construction purposes." *Id.* The prosecution history only limits the claims when the patentee's intent to surrender claim scope was "clear and unmistakable." *Cordis Corp. v. Medtronic AVE, Inc.*, 339 F.3d 1352, 1358 (Fed. Cir. 2003) (finding that a statement "amenable to multiple reasonable interpretations" did not constitute "a clear and unmistakable surrender"). This is a high standard, and generally is met only when the patentee "explicitly characterizes an aspect of his invention in a specific manner to overcome prior art." *Purdue Pharma L.P. v. Endo Pharma, Inc.*, 438 F.3d 1123, 1136-37 (Fed. Cir. 2006) (finding no disavowal of claim scope where inventors touted a feature to overcome the prior art, but that feature was not described as a "necessary feature" of the claimed formulations).

"Extrinsic evidence," on the other hand, "consists of all evidence external to the patent and prosecution history, including expert and inventor testimony, dictionaries, and learned treatises." *Phillips*, 415 F.3d at 1317. *Phillips* made clear that extrinsic evidence is "less significant than the intrinsic record in determining the legally operative meaning of claim language." *Id.* (internal cites omitted). A court may "rely on dictionary definitions when construing claim terms, so long as the dictionary definition does not contradict any definition found in or ascertained by a reading of the patent documents." *Id.* at 1322-23. Although dictionaries sometimes present difficulties because they collect many different definitions and may describe terms more generally or simply than would one skilled in the art, this is redressed by reading their definitions not as abstract pronouncements, but with the claim language and specification in mind. *Id.* at 1322-24; *Free Motion Fitness, Inc. v. Cybex Int'l, Inc.,* 423 F.3d 1343, 1349 (Fed. Cir. 2005) (in choosing between dictionary definitions, "the task is to scrutinize the intrinsic evidence in order to determine the most appropriate definition").

For the convenience of the Court, attached as Appendix B is a table of the claim terms by patent family (including the agreed-upon constructions) in the order addressed in this brief, including each party's proposed construction and with room for the Court's notes or constructions.

## IV.   ACI'S "INDEFINITENESS" ARGUMENTS HAVE NO MERIT

ACI's approach to simple claim language is exemplified by its contentions that readily understandable claim terms are insolubly ambiguous. ACI has not proposed constructions for the common claim terms "operatively associated with," "associated with," and "configured to cooperate with," instead contending that these terms, and the term "catheter" as used in claim 40 of the '602 patent, are "indefinite" under 35 U.S.C. § 112, ¶ 2. ACI's contentions are well off the mark; there is no ambiguity, let alone indefiniteness. ACI's burden is high:  it would have to prove indefiniteness by clear and convincing evidence. *See Datamize, LLC v. Plumtree Software, Inc.,* 417 F.3d 1342, 1347-48 (Fed. Cir. 2005). ACI would also have to show that those skilled in the art could not understand what is claimed when the claim is read in light of the specification, and that the claim is insolubly ambiguous. *Bancorp Servs., L.L.C. v. Hartford Life Ins. Co.*, 359 F.3d

1367, 1372 (Fed. Cir. 2004).  "[A] claim is not indefinite merely because it poses a difficult issue of claim construction; if the claim is subject to construction, *i.e.*, it is not *insolubly ambiguous*, it is not invalid for indefiniteness."  *Id.* (emphasis added).  ACI cannot meet its heavy burden.  The terms at issue are readily understandable by those of skill in the art, and some of them have even been expressly approved by the Federal Circuit and the leading treatise on claim drafting.

       **A.**        **"(operatively) associated with" ('602 patent, claims 38, 40)**

**St. Jude's Contingent Construction:**  *(functionally) connected, joined, combined, or linked*

      The terms "operatively associated with" and "associated with" are simple structural terms commonly used in patent claims.  The Federal Circuit has endorsed the use the of the term "operatively" as meaning "capable of performing the function."  *Innova/Pure Water*, 381 F.3d at 1120 (construing the term "operatively connected").  The Federal Circuit has also approved of the use of the term "associated with":  "the word 'associated' merely reflects that the recited elements be joined in some kind of relationship."  *Id.* at 1121.  The leading treatise on claim drafting states: "[f]unctional language does not render a claim indefinite...'[o]*peratively* connected' and '*associated*' are but two of the myriad examples that might be cited of functional or operational expressions *that are considered structural and proper* in a claim."  Ex. G (Faber (Formerly Landis) On Mechanics Of Patent Claim Drafting § 3:24 (6th. ed. 2009)) (emphasis added).  ACI's indefiniteness argument is frivolous—patent practitioners frequently use these approved terms.

      If these terms were to be construed, their common meaning would apply: "operative" means "[f]unctioning effectively" (Ex. H) and "associate" means "[t]o connect or join together; combine; link."  Ex. H.  The claim language makes clear that "operatively associated with" describes the recited structures functioning in combination.  For example, claim 38 of the '602 patent requires "a vessel plug *operatively associated with* said shaft member for insertion into the puncture...."  Stated another way, the plug and shaft member function in combination to insert the plug into the tissue tract.  Likewise, claim 40 of the '602 patent requires "a vessel plug *operatively associated with* said tubular member and said expandable member...," and goes on to describe the interplay between the vessel plug and expandable member:  "...said expandable member, when in said expanded condition...preventing said vessel plug from extending into said vessel or said

organ."  The specification supports the operative association:  "[t]he vessel plug **20** is then inserted into the incision along the shaft of the balloon catheter [*i.e.,* the tubular member]."  '375, col. 4:64-67; Fig. 3.

The phrase "associated with" appearing in claim 38 simply describes a relationship between the recited structures, such as connected, joined, combined or linked:  "control member operatively connected to said expandable member and *associated with* said shaft member...."  The specification supports this understanding, describing a "control member" (*e.g.* "a syringe") for inflating of the balloon attachable to a "shaft member" (*e.g.* a "balloon catheter"):  "the user may attach a syringe...on the proximal end **28** of the balloon catheter **22** to inflate the balloon **24**."  '375, col. 4:54-57, Fig. 3.

### B.       "configured to cooperate with" ('602 patent, claim 38)
**St. Jude's Contingent Construction:**  *constructed to work with*

ACI contends that the phrase "configured to cooperate with" is also insolubly ambiguous and therefore indefinite.  The common meaning of this phrase is well known.  Ex. H ("configured" means "[s]haped, fashioned, or constructed" and "cooperate" means "[t]o work or act together toward a common end or purpose.").

Claim 38 of the '602 patent provides the requisite context for the phrase:  the "expandable member [is] *configured to cooperate with* said plug when said expandable member is in said expanded condition to prevent said vessel plug from entering the vessel or the organ of the patient."  Simply put, the expandable member and plug function together to prevent the plug from entering the vessel.  The specification supports this understanding:  "[t]he vessel plug **20** is then inserted into the incision along the shaft of the balloon catheter **22** until the distal end **32** of the vessel plug **20** contacts the inflated balloon **24** on the distal end **26** of the balloon catheter **22**...the balloon **24** prevents the vessel plug **20** from extending into the artery **10**."  '375, col. 4:64-5:3.

While it is hard to imagine a phrase less likely to baffle someone of skill in the art, St. Jude offers the Court a construction that tracks common usage and is fully supported by the intrinsic record, should the Court conclude that any construction were necessary.

C.      "said catheter" ('602 patent, claim 40)

**St. Jude's Contingent Construction:** *for Fowler, a tubular member*

ACI does not contend that the term "catheter" is insolubly ambiguous.  Instead, it claims to be unable to discern its antecedent basis because the word "said" appears in front of the first use of the term "catheter."  This kind of labored indefiniteness argument is groundless:  "the failure to provide explicit antecedent basis for terms does not always render a claim indefinite."  *Energizer Holdings v. ITC*, 435 F.3d 1366, 1370 (Fed. Cir. 2006) (internal cites omitted).  For example, "an antecedent basis can be present by implication."  *Id.,* at 1371.

The implication here is obvious.  The claim language itself reinforces that "said catheter" refers to the "tubular member" recited earlier in the claim.  Those skilled in the art would know that a "catheter" is a "tubular member":  a "catheter" is "[a] tubular instrument to allow passage of fluid from or into a body cavity."  Ex. I.  Claim 40 of the '602 patent makes this even clearer; it recites a "tubular member" with "a distal end."  The claim then goes on to state "...said distal end of ***said catheter***...." (emphasis added).  "Said catheter" ***is*** the "tubular member."  The specification supports this simple fact, disclosing: "[*t*]*he balloon catheter* preferably...includes an inflatable balloon **24** *on the distal end* **26** thereof."  '375, col. 4:19-22 (emphasis added).  When the phrase is read in context, and without a strategic desire to misunderstand it, there is no ambiguity.

ACI also offers an alternative construction of "catheter" in which it adds additional, vague limitations:  a "*long,* *thin* tubular surgical instrument."  "Catheter," a term that appears in many of the asserted claims in both patent families, has a well understood meaning and needs no narrowing construction in Fowler.  The Court should note that Janzen uses "catheter" in a broader manner than Fowler, so that if any construction of "catheter" were required, the appropriate construction would be:  "***for Fowler***, a tubular member," which, as discussed above, is precisely how the claim itself defines this term.  The Fowler specification describes two types of catheters, both of which are tubular:  an "angiographic" catheter used in the catheterization procedure and a "balloon" catheter used in the invention.  *See, e.g.*, '375, col. 3:60-62; 4:8-12; 4:17-19.  In contrast, *Janzen* specifically states that "the term 'catheter' will be used here *in a very generic and broad way* to include not only 'catheters' in the strict sense,

but *any device* that is inserted into a blood vessel of the body."  '439, col. 1:38-41 (emphasis added).

## V.        DISPUTED CONSTRUCTIONS

### A.        Terms In The Fowler Patents That May Need Construction

#### 1.        "lumen" ('616 patent, claim 9)

**St. Jude's Construction:** *for Fowler,[3] space within a vessel or organ and the walls surrounding the space*

Because "lumen" appears only in the preamble of asserted claim 9 of the '616 patent, there is a presumption that the term is not limiting:  "[i]t is well settled that if the body of the claim sets out the complete invention, and the preamble is not necessary to give life, meaning and vitality to the claim, then the preamble is of no significance to claim construction…."  *Altris, Inc. v. Symantec Corp.*, 318 F.3d 1363, 1371 (Fed. Cir. 2003).  Here, the limitations in the body of the claim set forth the claimed invention.  Terms in the preamble like "lumen" are not needed to "give life" to the claim, which meaningfully describes the invention:  a "…method including the steps of:  forming a vessel plug…positioning the vessel plug…to seal the incision…."  '616, claim 9; *see also* '375, col. 4:44-5:27.

If this preamble term *were* limiting, the touchstone for interpretation would be the patentee's choice to define the term in a fashion specific to the Fowler patents.  Patentees may of course act as their own lexicographer when defining claim terms.  *Phillips*, 415 F.3d at 1321 ("the specification acts as a dictionary when it expressly defines terms used in the claims or when it defines terms by implication.") (internal cites omitted).  While, as a general matter, "lumen" refers just to the space within a vessel or organ, St. Jude's proposed definition of "lumen" acknowledges Fowler's particular use of the word in the claims and specification, referring to a space within a vessel *and also the walls surrounding that space*.  The claim language reads "through the lumen of a blood vessel and into the blood vessel of a patient"—using "lumen" to refer to "wall."  To get

---

[3] The term "lumen" also appears in the Janzen patents, where it is used differently.  *See* below at V.C.1.  It is legal error to define the terms in Fowler indiscriminately using the disclosures in Janzen and *vice versa.  See Goldenberg v. Cytogen, Inc.*, 373 F.3d 1158, 1167-68 (Fed. Cir. 2004) ("Absent a formal relationship" statements in another patent or its prosecution history are irrelevant to claim construction).

into the blood vessel the device needs to go "through the 'lumen.'"  Making this usage even clearer, Fowler's specification refers to the exterior of the arterial wall as the "outer lumen of the artery" and the interior of the arterial wall as the "inner lumen of the artery."  '375, col. 4:37-40; 4:60-63. Fowler clearly uses the term to include both the space within the vessel *and* the wall itself.

ACI's proposed construction carefully ignores the patentee's usage in the specification, seeking to excise "wall" from Fowler's definition.  ACI also proposes adding a limitation:  that the space must be an "*open* space."  The Fowler specification contradicts ACI's construction, stating that the invention is used with veins and arteries containing blood.  *See, e.g.*, '375, col. 4:37-40; 6:47-52.  Such spaces are not "open."

## B.     Terms In The Fowler Patents That Need No Construction

Facing claims whose plain language describes their products, ACI proposes constructions for no fewer than *twenty* well-understood terms and phrases in the asserted claims of the Fowler patents.  Each of these terms is a  common word or phrase that is used in accordance with its commonly understood meaning.  The actual claim language itself most appropriately describes the scope of the inventions and no construction of these terms is necessary or appropriate.

### 1.     "adjacent" ('602 patent, claim 43)

<u>**St. Jude's Contingent Construction:**</u>  *close to*



Fig. 7

plug

locating wing

This term is as ordinary as they come, but, if the Court finds it necessary to construe it, it should apply the dictionary definition: "close to."  Ex. H.  The Fowler claims and specification support this construction, and make clear that the term is not limited to "abutting" as ACI proposes; two objects can be "adjacent," or near to one another, without actually touching, or "abutting."  The specification discloses "positioning the distal end **32** of the vessel plug **20** at *or near* the outer lumen of the artery."  '375, col. 5:41-43 (emphasis added).  It also discloses "the vessel plug **52** is located in a predetermined position within the outer and inner sleeves **56** and **58** and *adjacent* to the locating wings **64** as shown in FIGS. 6 and 7."  *Id.*, col. 6:28-34 (emphasis added).  In figure 7 (excerpted and annotated), the vessel plug **52** and the locating wings **64** do *not*

abut each other, yet they are adjacent.  The '602 patent claims also refer to positioning the distal end of a vessel plug "generally adjacent to the blood vessel."  '602, claim 16.  The phrase "generally abutting" is nonsensical.

### 2.    "vessel plug" ('616 patent, claim 9; '602 patent, claims 38, 40, 43; '375 patent, claim 21)

**St. Jude's Contingent Construction:**  *mass that obstructs a hole in a vessel*

Fowler uses this term according to its common meaning, for example, the dictionary definition of "plug" is a "mass obstructing a hole or intended for closing a hole."  Ex. J.  The Fowler claims make things perfectly clear:  claim 9 of the '616 patents, for instance, states the "vessel plug" is positioned to "seal the incision from the flow of blood passing through the vessel." *See also,* '375, col. 4:29-44.

ACI again seeks to add improper limitations.  ACI asserts that the plug in the Fowler patents must "occup[y] and fill[] a hole in a vessel."  The Fowler claims and specification contradict ACI's assertion, clearly stating that the claimed vessel plug can be on the "outer surface" of the vessel, not "occupying and filling" the hole in the vessel.  Claim 6 of the '616 patent describes, *inter alia*, a "…vessel plug is positioned along the *outer surface* of the blood vessel."  *See also, e.g.,* '616, claim 8, '602, claim 1; and '375, claim 24.  The preferred embodiment states that "the distal end **32** of the vessel plug **20** is preferably contoured to conform to the outer lumen of the artery" and "the vessel plug **20** is aligned with the outer lumen of the artery...."  '375, col. 4:38-40; 5:1-3.

### 3.    "puncture" ('602 patent, claims 38, 40, 43) / "incision" ('616 patent, claim 9; '602 patent, claims 38, 40, 43; '375 patent, claim 21)

**St. Jude's Contingent Construction:**  *hole or slit/opening created during a procedure*

While unnecessary, were the Court to construe these terms, Fowler uses both terms "puncture" and "incision" according to their common meaning, referring to the hole or slit created by the catheterization procedure.  For example, claim 38 of the '602 patent states "...an incision or puncture in the body of a living patient, wherein the incision or puncture extends into the blood vessel...."  The specification confirms this usage, stating that "[d]uring catheterization procedures, the nurse or physician will create an opening into an artery or other vessel...The size of the

opening will vary depending on the type of procedure and the size of the catheter used."  '375, col. 1:22-27.  This opening is generally created by "an angiographic needle...[that] is inserted between 6 mm and 70 mm percutaneously into the skin of the patient until the needle pierces the femoral artery."  *Id.*, col. 3:63-4:2; *see also* 3:49-56 ("...the present invention for sealing an incision or puncture in a blood vessel such as the femoral artery **10** of a patient...the present invention may be used with nearly any catheterization or other medical procedure wherein it is desirable to seal an incision or puncture to prevent the loss of the patient's body fluid...").

ACI asserts that an "incision" is limited to a "cutting wound," and a "puncture" is limited to a "piercing wound."  ACI's constructions will result in needless confusion.  A hole created by a needle is both a "piercing wound" and a "cutting wound."  Needles are not blunt objects, but instead contain a cutting edge ending in a sharp point.  This is reflected by the use of both "puncture" and "incision" to describe the same openings.  Here, "puncture" and "incision" are two "[d]ifferent terms or phrases in separate claims [that] may be construed to cover the same subject matter where the written description and prosecution history indicate that such a reading of the terms or phrases is proper."  *Nystrom v. Trex Co.*, 424 F.3d 1136, 1143 (Fed. Cir. 2005).

        **4.**        **"dimensioned to be received in" ('616 patent, claim 9) / "dimensioned to be positioned within" ('602 patent, claim 40) / "dimensioned to be inserted within (the puncture so that said expandable member is positioned within)" ('602 patent, claim 38)**

**St. Jude's Contingent Construction:**  *sized to fit into / sized to fit into / sized to fit into the puncture so that the expandable member is positioned within*

It is hard to imagine phrases that more accurately define themselves; they say simply that the claimed element of the device (the plug, the shaft member, or the expandable member) must be the right size to fit into the incision or puncture.  The additional language in claim 38 of the '602 patent, "so that said expandable member is positioned within" the vessel, also means exactly what it says:  the expandable member must ultimately be in the vessel.  The specification confirms: "[t]he balloon catheter...includes an inflatable balloon **24** on the distal end **26** thereof" ('375, col. 4:19-21); "the balloon catheter **22** is properly positioned in the incision so that the distal end **26** of the balloon catheter extends into the artery..."  *Id.,* col. 4:49-51.

For claim 9 of the '616 patent, ACI proposes that the "diameter" of the plug must be "*small* enough" to fit in the incision.  The claim does not require the size to be large or small—only appropriately sized.  Further, having a "diameter" requires a plug that is cylindrical, but the specification discloses that a "cylindrical rod-shape" is merely preferred, not required ('375, col. 4:29-35).  *See Phillips*, 415 F.3d at 1323 ("[A]lthough the specification often describes very specific embodiments of the invention, we have repeatedly warned against confining the claims to those embodiments.").

For the claims in the '602 patent, ACI takes a different tack, asking the Court to rewrite the "dimensioned" claims entirely.  It proposes construing both phrases as "a *shaft member* small enough to pass through the incision and long enough so that the expandable member can be inserted into the target organ or blood vessel."  Claim 40 does not even include a "shaft member," let alone one that is "small."

### 5.   "relaxed" / "expanded" ('602 patent, claims 38, 40, 43)

**St. Jude's Contingent Construction:**  *deflated/inflated*

ACI's proposal that "relaxed" means "slack" and "expanded" means "enlarged" are as vague as they are divorced from the specification and the claims.  There is no benefit to replacing the patentee's words with ACI's.

While the actual claim language is preferable, were the Court to determine that "relaxed" and "expanded" need definition, the intrinsic record explains both terms.  The asserted '602 patent claims all require an expandable member (*e.g.,* a balloon on the end of a balloon catheter).  The specification discloses that "...the user...*inflate*[*s*] the balloon...."  '375, col. 4:53-57 (emphasis added).  "Once the vessel plug **20** is properly positioned...the balloon **24** is *deflated*...."  *Id.*, col. 5:3-6 (emphasis added).

### 6.   "(located / extends) proximally of" ('616 patent, claim 9; '602 patent, claim 38; '375 patent, claim 21)

**St. Jude's Contingent Construction:**  *close to*

The common meaning of "proximally" is "close to."  Ex. K.  The Fowler claims and specification disclose locating the "vessel plug...proximally of the blood vessel."  *See, e.g.,* '616,

claim 9.  The specification discloses "positioning the distal end **32** of the vessel plug **20** *at or near* the outer lumen of the artery." '375, col. 5:41-43 (emphasis added); *see also* Ex. L ('616 FH 4/17/95 Response, pp. 3-4 (plug not introduced into vessel)); Ex. M ('616 FH 8/15/95 Notice of Intent to Issue Reexamination Certificate, p. 2 (same)).  It could hardly be simpler:  "at or near" is "close to" the outer lumen of the vessel—the site at which the specification indicates the plug needs to be positioned in the claimed step.

ACI proposes vague, unnecessary constructions that conflict with the patent's basic teachings and would render terms redundant.  For example, ACI proposes that to be "proximal," the plug must be located "away from the midline of the blood vessel."  The plug does not advance into the vessel:  the expandable member, for instance a balloon, "prevents the vessel plug from entering the vessel." *See* '602, claim 38.  Because the plug does not enter the artery, by definition it is not at the center of the artery (*i.e.* at the midline).  The plug, and everything else not at the artery's center, whether in the patient or ten feet away, is "away from the midline."

### 7.    Remaining Terms That ACI Insists Need Construction

Fowler does not ascribe any specialized meaning to the remaining terms that ACI proposes for construction; they are easily understood by lay jurors and those of ordinary skill in the art.  *See Ethicon,* 103 F.3d at 1568 (claim construction is "not an obligatory exercise in redundancy.").  Construing these terms as ACI proposes would alter claim scope and foster ambiguity.  For example, ACI's construction of "without extending into" and "preventing...from extending into" oddly repeats the claim language, but adds "open space," adding limitations where none exist.  Other clear terms such as "seal," "distal, and "proximal" ("distal" means further away; "proximal" means closer—Ex. H) likewise need not be encumbered with baseless limitations.  St. Jude's positions on these terms are presented in the parties' Joint Claim Construction Chart, Dkt. No. 47.

**C.   Terms In The Janzen Patents That The Parties Agree Need Construction**

For the Janzen patents, the parties agree that three phrases and one means-plus-function claim limitation need construction.

### 1.   "lumen" ('498 patent, claim 1)

**<u>St. Jude's Construction</u>:**  *for Janzen, space within a vessel or organ*

The Janzen and Fowler patents both use the term "lumen," but do so differently.  As described above in Section V.A.1, *Fowler* acts as his own lexicographer by defining this term in a specific manner.  *Janzen*, on the other hand, uses this term consistently with its common meaning: "[t]he space within an artery, vein, intestine, or tube."  Ex. J.  The parties agree that for Janzen, the construction of this term should at least include:  "space within a vessel or organ."  ACI also adds the confusing limitation that the vessel space must be "open," rather than full of blood.

### 2.   "hemostatic material" ('498 patent, claim 1)

**<u>St. Jude's Construction</u>:**  *material that acts to stop the flow of blood*

Claim 1 of the '498 patent reads:  "[a] method of sealing a puncture in a blood vessel..."  The claim language makes clear that sealing is achieved by placing "hemostatic material...adjacent the outside wall" of a blood vessel.  The hemostatic material acts to stop the flow of blood, sealing the puncture.  '439, col. 7:30-39.  Dictionaries define "hemostatic" as "acting to stop the flow of blood."  Ex. H.

### 3.   "threading a plug over said guide wire...[and] moving the plug inwardly along the guide wire" ('439 patent, claim 10)

**<u>St. Jude's Construction</u>:**  *passing a plug over the guide wire and moving the plug inwardly along the guide wire*

While "threading" has a variety of common usages, these phrases must be construed in the context of the entire claim in which they are included.  *See ACTV, Inc. v. Walt Disney Co.*, 346 F.3d 1082, 1088 (Fed. Cir. 2003).  Both phrases relate to the movement of the plug in the tissue channel and require:  (1) that the plug pass "over" the guide wire and (2) that the plug move inwardly "along" the guide wire.  Without the phrase "threading a plug over...," it would not be clear that the wire has to pass through the plug; for example, the plug could be moved "inwardly

along" by moving the plug next to rather than over the guide wire.  The second phrase simply requires that the plug move toward the puncture using the guide wire as a guide.

ACI's complicated proposal that "threading" requires moving a "guide wire *into and through* the lumen..." is wrong.  The intrinsic record does not support the notion that the guide wire must be moved "into *and* through" the lumen of the plug.  The specification discloses that the plug is passed "over" the wire:  "[t]he plug is slid down along the guide wire through tissue channel **9** until its front end reaches the wall of the femoral artery."  '439, col. 7:44-47.  But it does not require that the wire must first be inserted *into* the plug:  the wire may already be inside the plug, in which case it would not have to be moved "into" it.  To be sure, the specification allows for an embodiment where the wire can be inserted into the plug:  "[t]he proximal end of the guide wire **15** *can* be fed through lumen **85** and through the collagen membrane **81**."  *Id.*, col. 7:43-47 (emphasis added).  But this language is merely permissive, not mandatory.  The claim is clearly broader, and there is no reason to import a limitation from the specification.  *Phillips*, 415 F.3d at 1323.

When the specification wants to indicate that a guide wire should be inserted into something, as opposed to merely having the plug passed over it, the specification is explicit. For example, Janzen states that "[i]f no guide wire has been employed, prior to the removal of the catheter and cannula, a guide wire may be *inserted*." *Id.*, col. 4:17-18 (emphasis added). This embodiment describes the special circumstance where a guide wire must be freshly inserted because it was not there before. In contrast, claim 10 does not use the term "inserted," and instead uses the term "over" (as in threading *over* or passing *over*).

The phrase "moving said plug inwardly along the guide wire" does not contain any technical or unclear terms and needs no separate construction.  ACI proposes adding the limitation that the plug begin at the "proximal end" of the guide wire.  The plain meaning of this phrase has no such limitation and there is no reason to add one.  ACI's construction also makes the claim less clear:  ACI vaguely proposes that the plug must move "towards the patient."  A patient's body has

many parts and, in surgery, can be placed in a variety of positions.  In the claimed invention, however, the plug is moved towards the *artery within the tissue channel* in the patient.

4.      **"means for ejecting said plug means from said distal end of said elongated member so as to place said plug means in a blocking relation with said puncture, so as to seal said puncture" ('439 patent, claim 1)**

**St. Jude's Construction:**  governed by § 112, ¶ 6

**Function**:  ejecting said plug means from said distal end of said elongate member so as to place the plug in a blocking relation with said puncture, so as to seal said puncture

**Structure**:  a plug pusher (for example, plug pusher 33, fig. 1) and retracting sheath (for example, sheath 45, fig. 16), and equivalents thereof

The parties agree that this phrase is a "means-plus-function" term governed by 35 U.S.C. § 112, ¶ 6.  Under § 112, ¶ 6, "a patentee may express an element in a claim as a means for performing a specified function without reciting the particular structure that performs the recited function...the 'means-plus-function' limitation must be construed to cover the corresponding structure, material, or acts described in the specification and equivalents thereof."  *Commonwealth Sci. & Indus. Research Org. v. Buffalo Tech., Inc.*, 542 F.3d 1363, 1383 (Fed. Cir. 2008) (internal cites and quotes omitted).  Construction of a means-plus-function limitation involves a two-step process:  (1) "identify[ing] the function of the means-plus-function limitation;" and (2) "identify[ing] the corresponding structure in the written description necessary to perform that function."  *Minks v. Polaris Indus.*, 546 F.3d 1364, 1377 (Fed. Cir. 2008) (internal cites and quotes omitted).  The Court's claim construction should of course make clear that "[w]hen the claims include means-plus-function terms in accordance with § 112 ¶ 6, claim scope necessarily is not limited to the preferred embodiments, but includes equivalents thereof."  *Vulcan Eng'g Co. v. FATA Aluminum, Inc.*, 278 F.3d 1366, 1376 (Fed. Cir. 2002).[4]

The first step of the means-plus-function analysis is straightforward.  In identifying the claimed function, the Court should recognize the function explicitly recited in the claim:  "ejecting said plug means from said distal end of said elongate member so as to place the plug in a blocking relation with said puncture, so as to seal said puncture."  Section 112, ¶ 6 "does not permit

---

[4] Should the Court determine that any other limitations are governed under § 112, ¶ 6, the identification of structure for such limitations should also end with the statutory language:  "and equivalents thereof."  35 U.S.C. § 112, ¶ 6.

limitation of a means-plus-function claim by adopting a function different from that explicitly recited in the claim."  *Micro Chem., Inc. v. Great Plains Chem. Co., Inc.*, 194 F.3d 1250, 1258 (Fed. Cir. 1999).  In square opposition to the established standard, ACI proposes that the claimed function should be cut short, limiting it just "for ejecting said plug means."

As for the second step, Janzen discloses a variety of structural elements for achieving the claimed function, including various implementations of a "plug pusher" or "plunger," and a "retracting sheath."  In the Joint Claim Construction Chart, ACI identified the corresponding structure as item **33** in Figure 1 (described in the specification as "plug pusher **33**"), while St. Jude identified various "plungers," including "plug pusher **33**."  To eliminate one of the disputes between the parties, St. Jude has adopted the language, "plug pusher," that ACI has previously identified. The different types of plug pushers disclosed in the specification are illustrated in figures 1 and 4 ("plug pusher **33**" described at '439, col. 3:52-54; 4:1-9; 6:9-14); figures 2 and 3 ("plug pusher **69**" described at '439, col. 6:32-37); figures 16-20 ("plunger **95**" described at '439, col. 8:63-9:25).  A retracting "sheath **45**" is illustrated in figures 16-20 and described as "a plunger **95** is used to push (see arrow C) plug **93** into and through sheath **45** until the plug exits the sheath so as to cover puncture **13** and fill that section of channel **9** which is adjacent puncture 13 (see FIGS. 17 and 17a).  Simultaneously, sheath **45** is slightly withdrawn (indicated by arrows D on FIG. 17) to permit plug **93** to be fully discharged from the sheath."  '439, col. 8:63-9:25.  As a matter of basic patent law, the claimed "means" includes all of these embodiments and equivalents thereof.

ACI wishes to limit the corresponding structure to just a single embodiment in the specification—the "plug pusher **33**" in Figure 1 and the corresponding description at '439, col. 4:1-13.  In its construction, ACI relies on disclosures in the specification detailing unclaimed elements relating to plug pusher **33**.  The single embodiment and description that ACI seizes on involves a plug pusher that also serves as a tissue dilator for enlarging the channel to the puncture in the artery. *Id.,* col. 4:12-13.  But there is no "tissue dilator" in the claims, nor a tissue-dilating function, and rewriting the claims to limit them to a single embodiment that adds a tissue dilator is plainly

improper:  § 112, ¶ 6 "does not permit incorporation of structure from the written description *beyond that necessary to perform the claimed function*."  *Micro Chem.*, 194 F.3d at 1258 (emphasis added).

ACI offers an alternative construction if § 112, ¶ 6 is not applied, in which it seeks to add a negative limitation:  according to ACI, the claimed means must "…not extend past the front end of the elongate member."  ACI carefully ignores the disclosure of a contrary embodiment in the specification:  "while plunger **103** continues to hold plug **101** in place (see arrow H), sheath **45** is withdrawn from channel **9** (see arrows G on FIG. 20)."  '439, col. 9:20-25.  Figure 20 (excerpted and annotated) shows the plunger (the "means for ejecting…") extending past the elongate member's end.



### D.    Terms In The Janzen Patents That Need No Construction

ACI proposes constructions for no fewer than *fifteen* other well-understood terms and phrases in the Janzen patents.  These terms are common words or phrases that are used in accordance with their commonly-understood meaning, and the actual claim language itself most appropriately describes the scope of the inventions.

### 1.    "adjacent"  ('498 patent, claim 1)

**St. Jude's Contingent Construction:**  *close to*

While construction of this elementary term is unnecessary, Janzen uses the term in accordance with its common meaning.  Claim 1 of the '498 patent uses this term to describe the placement location of the "hemostatic material" in relation to the blood vessel.  The specification discloses that "hemostatic material" may be placed close to *or* abutting the blood vessel.  '439, Fig. 15A; col. 8:18-26 ("...neither the hemostasis sheath **45** nor the dilator **17** are pushed through the channel **9** all the way to arterial puncture **13**…they are inserted no further than to within about ¾ cm of the artery."); *see also* col. 2:29-33.

ACI's effort to eliminate "close to" is not just in conflict with the dictionary, but also with the specification, which uses two forms of "adjacent" to describe positioning:  "adjacent" and "immediately adjacent."  *See, e.g.*, *id.*, col. 8:4-17; 8:61-9:5.  "Adjacent" includes "close to" and

"abutting," while immediately adjacent means "abutting."  ACI's erroneous construction results in the nonsensical phrase "immediately abutting."

### 2.   "plug" ('439 patent, claims 1, 7, 8, 9, 10) / "plug member" ('439 patent, claim 8) / "plug means" ('439 patent, claims 1, 7)

**St. Jude's Contingent Construction:**  *mass that obstructs a hole*

If the Court were to construe this term, it should be given its common meaning as discussed above at Section V.B.2 (discussion of "vessel plug").  The specification describes using "a plug, preferably a collagen plug or plug of some other resorbable material, to seal the artery along its outside wall."  '439, col. 2:22-24.  Janzen specifically notes that "[t]he physical form of the plug may vary widely, with the one selected by the physician being dependent upon the circumstances of the case."  *Id.,* col. 6:65-7:3.



FIG. 17A

ACI again seeks to add improper limitations.  ACI asserts that the plug in the Janzen patents must "occup[y] and fill[] a hole."  Janzen's claims are not that narrow:  ACI's construction contradicts Janzen's disclosure that the plug can form a "bandage-like covering *over* puncture."  '439, col. 7:54-57 (emphasis added); Figs. 10, 11, 18-19, and 21 (Fig. 17A excerpted and annotated).  Nor must the plug fill the tissue channel before exiting the elongate member; for example, the specification discloses that the tissue channel ("hole") can also be filled with the elongate member, the catheter sheath, and the guide wire.  *See, e.g., id.*, Figs. 9, 14.

ACI also seeks to import a "size" limitation for the terms "plug member" and "plug means" (part of the larger phrase "plug [member/means] for plugging said puncture being disposed in said elongate member"):  ACI proposes that the plug, while in the elongate member, must have "a diameter…larger than the puncture."  This dubious limitation collides with the explicit disclosure that "it would be within the scope of the instant invention to use the procedure cannula as the delivery sheath through which hemostatic material is passed."  *Id.*, col. 9:52-56.  Because the existing "procedure cannula" enters the arterial puncture and the plug, in turn, fits into the procedure cannula (it is the delivery sheath), the plug would *necessarily* be smaller than the puncture.  *Id.*

ACI's construction also fosters ambiguity, attempting to import a "shape" limitation.  The puncture in the artery is not a fixed size or shape:  "when the procedure cannula is removed both the arterial puncture **13** and the tissue channel **9** tend to close up somewhat."  *Id.*, col. 8:18-20.  Moreover, the plug expands after the retraction of the plug sheath:  "...after exiting from sheath **45**, [the plug] naturally expands..."  *Id.*, col. 9:31-35.  It is unclear at what point in time ACI would compare the puncture and plug sheath sizes.  It is also unclear how or where one would measure the puncture, as the puncture is not perfectly round:  "punctures...will generally...be in the nature of slits...*the shape of the puncture...is not critical*..."  *Id.,* col. 3:43-48 (emphasis added).

### 3.   "puncture" ('498 patent, claim 1; '439 patent, claims 1, 8, 9, 10)

**St. Jude's Contingent Construction:**  *a hole or slit*

While it hardly requires construction, "puncture" could be construed as described in the Janzen specification:  punctures "will generally...be in the nature of slits, for ease of understanding, they are depicted in the drawings herein more as holes...[but the] shape of the puncture...is not critical."  '439, col. 3:43-48.

ACI proposes replacing the term "puncture" with the vague phrase "piercing wound."  But the specification states that the puncture can be a slit and that the shape is unimportant.  Limiting the puncture to something produced by "piercing" is vague, confusing, and unnecessary.

### 4.   "guide wire" ('439 patent, claims 9, 10) / "guide element" ('439 patent, claim 8)

**St. Jude's Contingent Construction:**  *(wire) / (element) used to assist in positioning*

By its own terms, a guide wire is a wire that guides.  In this particular case, the guide wire guides other elements of the vascular closure device towards their appropriate destination.  The claim language states that the guide wire is used "for guiding said plug (means/member) to said puncture."  '439, claims 1, 8.  The specification similarly discloses using the guide wire to position the plug:  "[t]he plug is slid down along the guide wire through tissue channel **9** until its front end reaches the wall of the femoral artery."  *Id.*, col. 7:44-46.  The specification discloses the guide wire can also be used to help place a tissue dilator or the sheath surrounding the plug.  *Id.,* col. 4:11-13, 48-52.

ACI seeks a radical narrowing of the claims, proposing that the claimed guide wires are only used "for guiding and exchanging *catheters*," even though the specification discloses that

guide wires are used for multiple purposes (*e.g.*, positioning the plug, the plug sheath, or a tissue dilator).  *Id.*  The specification even discloses that the guide wire used for the catheterization procedure need not be used for plug placement.  Instead, a guide wire just for the placement of the vascular closure device can be used:  "[i]f no guide wire has been employed, prior to the removal of the catheter and cannula, a guide wire may be inserted."  *Id.,* col. 4:17-18.

ACI also proposes to narrow "guide *element*" to "guide *wire*."  While some claims use the term "guide wire," others use the term "guide element."  There is no reason to conflate terms that the patentee expressly differentiated.  "When different words or phrases are used in separate claims, a difference in meaning is presumed."  *Nystrom*, 424 F.3d at 1143.  The presumption applies here:  the patentee's chosen term, "element," is obviously broader than ACI's term, "wire," and encompasses materials other than wires.

### 5.        "blocking relation" ('439 patent, claims 1, 8, 9, 10)

**St. Jude's Contingent Construction:**  *positioned to impede the passage through*

If the Court were to conclude that any clarification of this phrase is necessary, claims 1 and 8 state that the plug is placed "in a blocking relation with [the] puncture [in the artery], so as to seal [the] puncture."  Though St. Jude believes that the claim's own language says it best, this language requires that the plug impede the flow of blood, through either the puncture or the tissue channel, sufficiently to allow the puncture to seal.  The specification supports St. Jude's proposed construction, disclosing that the plug may "fill that section of channel **9** which is adjacent puncture **13**...," thereby resulting in sealing of the puncture.  '439, col. 9:2-3.  The extrinsic evidence also supports this construction—to "block" is "to stop or impede passage."  Ex. H.

ACI again seeks to add limitations, proposing that this phrase requires covering the perimeter of the entire puncture.  As shown in Figure 15A, however, the specification discloses that the plug does not even need to *contact* the puncture, let alone completely "cover" it, as long as upon expansion its cross-section "fill[s] that section of channel **9** which is adjacent puncture **13**."  '439, Fig. 15A; col. 7:51-

57; 9:2-3.  This is still a "blocking relation."  ACI's construction also fosters timing ambiguity: must the plug completely "cover" the puncture *before* or *after* expansion of the plug?  *See id.,* col. 9:31-35 ("...exiting from sheath **45**, [the plug] naturally expands...").

> **6.**  **"sized to be fitted through a passageway leading to said puncture so that said distal end is disposed near said puncture in said artery" ('439 patent, claims 1, 8)**

**St. Jude's Contingent Construction:** *having a size that fits through the passageway towards the puncture so as to put the distal end near the puncture in the artery*

This phrase underlines the fact that the '439 patent claims do not require a tissue dilator—the plug sheath is sized to fit in the existing tissue tract.  The specification discloses that *instead of* a tissue dilator, the existing "procedure cannula" (*i.e.,* the sheath used to insert the catheter) can be used.  '439, col. 9:52-56.  Because the plug sheath is inserted into the procedure cannula, and because the procedure cannula fits in the tissue tract in this embodiment, the plug sheath necessarily fits the tissue tract without the need for a dilator.  St. Jude's construction tracks these disclosures.

ACI seeks to import the limitation that the elongate member be "longer than the passageway to the puncture" in the artery.  But ACI ignores the disclosure of an embodiment in which the plug is not inserted all the way to the puncture, and in which the plug instead "fill[s] that section of channel **9** which is adjacent puncture **13**..."  '439 patent, Fig. 17, 17A; col. 9:1-5.  In that embodiment, the elongate member need not reach the actual puncture in the vessel.  The mere fact that the specification discloses an additional embodiment in which the elongate member is longer than the passageway does not support limiting the claims to that embodiment.  *Phillips*, 415 F.3d at 1323.

Not content with its added "*longer*" limitation, ACI also tries to import another size limitation:  that the elongate member must be "*wider* than the puncture in the artery."  The claim language says nothing about the width of the elongate member in relation to the hole in the vessel.  ACI ignores the disclosure that "it would be within the scope of the instant invention to use the procedure cannula as the delivery sheath through which hemostatic material is passed."  '439, col. 9:52-56.  Because the existing "procedure cannula" enters the arterial puncture, and the plug sheath in turn fits into the procedure cannula, this embodiment calls for a plug sheath that fits into, *i.e.* is not *wider* than, the puncture.

ACI's construction also fosters ambiguity.  The puncture in the artery is not a fixed size or shape:  "when the procedure cannula is removed both the arterial puncture **13** and the tissue channel **9** tend to close up somewhat."  *Id.*, col. 8:18-20.  It is unclear at what point in time ACI would compare the puncture and plug sheath sizes.  It is also unclear how or where one would measure the puncture, as the puncture is not perfectly round:  "punctures...will generally...be in the nature of slits...*[t]he shape of the puncture...is not critical.*"  *Id.,* col. 3:43-48.

### 7.    Remaining Terms That ACI Insists Need Construction

Because Janzen does not ascribe any specialized meaning to these terms and the terms are easily understood without any construction (*e.g.*, "seal"), St. Jude proposes that the actual claim language be used for these terms.  *See Ethicon,* 103 F.3d at 1568 (claim construction is "not an obligatory exercise in redundancy.").  Construing these terms as ACI proposes would add baseless limitations and foster ambiguity.  For example, ACI proposes that the phrase "[a] method…comprising the steps of" requires that steps be performed sequentially.  This proposal conflicts with the general rule that a method claim cannot be limited to performance of its steps in the order written unless either the claim language or the specification makes clear that "they *must* be performed in the order written."  *See, e.g.*, *Altris,* 318 F.3d at 1370 (emphasis added).  In the present case, the file history of the '439 patent makes clear that no such strict ordering is claimed or described.  Ex. N ('439 FH 9/7/2000 Amendment, p. 4 (claim covers both instances in which the exterior guide tube withdrawn prior to extending the plug into the tissue channel and exterior guide tube still in place when the plug extended)).

ACI also proposes that "extending a plug" should mean "stretching a plug."  It is clear, that the term "extending" encompasses the movement wherein the operator advances the plug into the tissue channel.  '439, col. 7:44-47.  Janzen makes no mention of "stretching" a plug or how such stretching would occur.

ACI suggests that the Court adopt a quote from the *Fowler* patents as the proper construction of "distal end" in *Janzen*.  That would be clear legal error.  *See Goldenberg*, 373 F.3d

at 1167-68 (statements in another patent or its prosecution history irrelevant to claim construction "[a]bsent a formal relationship or incorporation during prosecution" of the patent at issue).

Other clear terms such as "seal" and "device" likewise need not be encumbered with baseless limitations.  St. Jude's positions are presented in the Joint Claim Construction Chart.  Dkt. No. 47.

### E.  Terms On Which ACI Incorrectly Seeks To Impose Means-Plus-Function Restrictions

Section 112, ¶ 6 does not govern the '439 patent claim limitations that do not use the term "means," or which recite sufficient structure to perform the claimed function.  ACI's proposals conflict with these core principles.

### 1.  "ejecting mechanism for ejecting said plug member from said distal end of said elongated member so as to place said plug member in blocking relation with said puncture, so as to seal said puncture"  ('439 patent, claim 8)

Because the word "means" is not used in this claim, there is a presumption that § 112, ¶ 6 does not apply.  *See CCS Fitness Inc. v. Brunswick Corp.*, 288 F.3d 1359, 1369 (Fed. Cir. 2002). The presence of the "term 'means' is central to the analysis."  *Personalized Media Commc'ns. v. Int'l Trade Comm'n*, 161 F.3d 696, 703 (Fed. Cir. 1998).  As the party seeking application of § 112, ¶ 6, ACI bears "the burden of going forward with evidence to rebut...the presumption...by a preponderance of the evidence."  *Apex, Inc. v. Raritan Computer, Inc.*, 325 F.3d 1364, 1372 (Fed. Cir. 2003).  ACI cannot meet this burden.

This claim limitation recites more than sufficient structure—*i.e.* an "ejecting mechanism…[that discharges] the plug member from said distal end of said elongate member." ACI ignores the basic principle that "[t]he fact that a particular mechanism...is defined in functional terms is not sufficient to convert a claim element containing that term into a means for performing a specified function within the meaning of section 112(6)."  *Greenberg v. Ethicon EndoSurgery, Inc.*, 91 F.3d 1580, 1582 (Fed. Cir. 1996) (internal quotes omitted) (reversing district court and finding that a "detent mechanism" had sufficient structure because "'detent' denotes a type of device with a generally understood meaning in the mechanical arts, even though

the definitions are expressed in functional terms.").  As in *Greenberg*, "ejecting mechanism"

denotes a type of device with a generally understood meaning in the mechanical arts.[5]

> **2.    "separable plug means for plugging said puncture being disposed in said elongate member" ('439 patent, claim 1) / "movable guide means extending longitudinally through said elongated member and said plug means for extension through said puncture for guiding said plug means to said puncture" ('439 patent, claim 1)**

A threshold question for the Court is whether these claim limitations recite sufficient

structure to perform the claimed function.  Even if the term "means" is used, "[i]f…the claim

recites sufficient structure for performing the described functions in their entirety, the presumption

of § 112, ¶ 6 is overcome—the limitation is not a means-plus-function limitation."  *TriMed, Inc. v.

Stryker Corp.,* 514 F.3d 1256, 1259-60 (Fed. Cir. 2008).  Here, the first limitation explains that the

"means":  (1) must be a "plug" (addressed separately above); (2) that the plug be "separable" from

the rest of the device; and (3) that the plug be disposed in the elongate member.  Similarly, the

second claim limitation states that the "means":  (1) must be a "guide means" ("guide" is addressed

separately above with the terms "guide wire" / "guide element"); (2) must be "movable"

independent from the rest of the device; and (3) must pass through the elongate member and plug.

ACI itself admits that a similar limitations in claim 8 which contain the terms "plug member" and

"guide element" instead of "plug means" and "guide means" recite sufficient structure that § 112, ¶

6 does not apply.  *See* 439, claim 8.  The same is true here.

Numerous Federal Circuit cases have determined that such structural recitations can preclude

application of § 112, ¶ 6.  For example, in *Envirco Corp. v. Clestra Cleanroom, Inc.*, the Federal Circuit

reversed the district court's determination that "baffle means" is governed by § 112, ¶ 6 because, *inter

alia*, "[t]he term 'baffle' itself is a structural term...[and] the claims describe the particular structure of

this particular baffle."  209 F.3d 1360, 1365 (Fed. Cir. 2000); *see also TurboCare Division of Demag

Delaval Turbomachinery Corp. v. General Electric Co.*, 264 F.3d 1111, 1121 (Fed. Cir. 2001) (holding

that "radial positioning means" and "compressed spring means" do not invoke § 112, ¶ 6 because "the

---

[5] ACI also provides an alternate construction if § 112, ¶ 6 does not apply that is addressed above with the term "means for ejecting..."

claim recites sufficient structure to overcome th[e] presumption.").  As with "baffle means" in *Envirco,* there is adequate structure here to perform the recited functions.

If § 112, ¶ 6 applies, *the critical issue before the Court is identifying the structure recited in the specification for performing the claimed function.*  For "separable plug means...," the recited function is "plugging said puncture."  The corresponding structure disclosed in the specification is "a separable, resorbable plug being disposed in said elongate member, and equivalents thereof."  Janzen describes using "a plug, preferably *a collagen plug or plug of some other resorbable material*, to seal the artery along its outside wall."  '439, col. 2:22-24 (emphasis added).  Janzen specifically notes that "[t]he physical form of the plug may vary widely, with the one selected by the physician being dependent upon the circumstances of the case."  *Id.,* col. 6:67-7:3.  Indeed, the specification discloses many types of plugs (*see, e.g.*, Figs 12A-12E) for disposition in the elongate member.  *Id.,* col. 6:66-7:63.  All of the plugs are separable from the sheath, because the plug is discharged from the sheath when the sheath is retracted.  *Id.,* col. 9:3-5 ("Simultaneously, sheath **45** is slightly withdrawn to permit plug **93** to be fully discharged from the sheath.").[6]

Section 112, ¶ 6 "does not permit incorporation of structure from the written description beyond that *necessary* to perform the claimed function."  *Micro Chem.*, 194 F.3d at 1258 (emphasis added).  ACI ignores this rule repeatedly:  (1) citing to only a single plug embodiment (shown in Fig. 12e); (2) importing limitations about the supposedly specified diameter of the plug (addressed above for the terms "plug" / "plug means" / "plug member"); and (3) citing to passages from the specification in its actual construction, passages that describe interrelations between the plug and guide wire ('439, col. 7:40-50).  The function is plugging a hole—only a resorbable plug is necessary.  The Court should reject ACI's attempt to burden this straightforward function with a grab-bag of added limitations.

For "movable guide means...," the recited function is "guiding said plug means to said puncture."  Again, identifying the corresponding structure is the critical issue—it is "a guide wire (for

---

[6] ACI also provides an alternate constructions if § 112, ¶ 6 does not apply.  ACI's alternate constructions are addressed above with the terms "plug"/"plug member"/"plug means" and "guide wire," respectively.

example guide wire **15**) capable of movement independent from said elongated member and said plug means and extending longitudinally through said elongated member and said plug means for extension through said puncture, and equivalents thereof."  The specification discloses using the guide wire to position the plug:  "[t]he plug is slid down along the guide wire through tissue channel **9** until its front end reaches the wall of the femoral artery."  '439, col. 7:44-46; *see also* Figs. 14, 14A.

ACI identifies some of the same structure (guide wire **15**), but also cites to passages in its construction describing the use of an optional tissue dilator (*id.*, col. 4:11-13) and the feeding of the guide wire into the plug (*id.*, col. 7:43-49) (addressed above for the term "threading").  As discussed above, § 112, ¶ 6 "does not permit...incorporation of structure from the written description beyond that *necessary* to perform the claimed function."  *Micro Chem.*, 194 F.3d at 1258 (emphasis added).  ACI's importation of these limitations should be rejected.

## VI.    CONCLUSION

St. Jude respectfully requests that the Court adopt its constructions, which are consistent with the plain meaning of the claims, the intrinsic record, and established rules of claim construction.

Dated:  December 1, 2009

Respectfully submitted,

*/s/* Andrei Iancu

Nicholas H. Patton
(nickpatton@texarkanalaw.com)
PATTON, TIDWELL & SCHROEDER, LLP
P.O. Box 5398
Texarkana, TX 75505-5398
(903) 792-7080
(903) 792-8233 (facsimile)

Morgan Chu (mchu@irell.com)
Jonathan Steinberg (jsteinberg@irell.com)
Andrei Iancu (aiancu@irell.com)
Maclain Wells (mwells@irell.com)
IRELL & MANELLA LLP
1800 Avenue of the Stars, Suite 900
Los Angeles, CA  09967
(310) 277-1010
(310) 203-7199 (facsimile)

Attorneys for Plaintiffs St. Jude Medical, Inc.
and St. Jude Medical Puerto Rico LLC

## <u>CERTIFICATE OF SERVICE</u>

The undersigned hereby certifies that the foregoing document was served on counsel of record by electronic filing and electronic service this December 1, 2009.

<u>/s/ Jay Chung          </u>